IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOHNNY W. MARTIN, | ) | 4:10CV3116 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Johnny W. Martin ("Martin") brings this suit challenging the Social Security Commissioner's final administrative decision denying his applications for disability insurance benefits and supplemental security income payments under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq.,1381 et seq.[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

## I.  BACKGROUND

In October 2005, Martin filed his applications for Title II and XVI benefits, claiming that he became disabled on September 30, 2003 (Tr. 80-82).[2]  He was 35

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Titles II and XVI.

[2] Previously filed applications for Title II and XVI benefits were denied in July 2002 and September 2004 (Tr. 44-51).  In the 2002 applications, Martin claimed he was unable to work because of hepatitis C, scoliosis, and bursitis in his hips and shoulders; the Commissioner determined that Martin had a history of being treated for some of the conditions, but that they did not impose significant functional restrictions on his activities (Tr. 44).  In the 2004 applications, Martin claimed he was disabled because of severe back sprain and strain, subluxation complex, and hepatitis C; the

years of age as of his alleged disability onset date (Tr. 80).  He has a tenth-grade education (Tr. 146) and past relevant work experience as a press operator, cook, janitor, construction worker, and roofer (Tr. 27, 87, 96, 118-30, 138-39).  Martin claimed to be disabled because of back pain, hepatitis C, and vision problems; the Commissioner determined that although Martin required a period of recovery from back surgery that was performed in November 2004, he was not entitled to benefits because by March 2005 he was able to return to work activities that did not require heavy lifting or frequent bending and stooping (Tr. 52-69).

After his applications were denied, Martin requested further review by an administrative law judge ("ALJ") (Tr. 42-43, 52-70). In October 2008, following a hearing at which Martin was represented by an attorney (Tr. 434-75), the ALJ determined that Martin was not disabled (Tr. 15-28). The ALJ concluded that Martin was not disabled because, despite his severe back and shoulder impairments, Martin could still perform his past relevant work as a press operator, as well as other light exertional work that existed in significant numbers in the national economy, including work as a meat cutter, hand packer, and solderer-assembler (Tr. 20, 27). The Appeals Council denied Martin's subsequent request for review (Tr. 7-9, 13, 419-29), thus rendering the ALJ's decision the Commissioner's final decision.

### A.  The ALJ's Findings

In his decision, the ALJ evaluated Martin's claim according to the 5-step sequential analysis prescribed by the Social Security Regulations.[3]  Among other

---

Commissioner found that within 12 months Martin's condition should be improved enough that he would be able to work at less strenuous jobs than his past work, and thus he was not disabled (Tr. 48).

[3]     The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not

things, the ALJ found that:

1.    Martin has not engaged in any substantial gainful activity since September 30, 2003, the alleged disability onset date (Tr. 20).

2.    Martin has the following severe impairments: "Degenerative disc disease of the lumbar spine, status post L5-S1 fusion; status post arthroscopic surgery, left shoulder" (Tr. 20).

---

go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. Before we go from step three to step four, we assess your residual functional capacity. . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps. These are the five steps we follow:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

3. Martin does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Tr. 21).

4. Martin "has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 of 8 hours; sit 6 of 8 hours; occasionally climb stairs, balance, stoop, kneel, crouch and crawl; never climb ropes/scaffolds/ladders; avoid concentrated exposure to vibration and hazards; and perform not more than occasional overhead reaching with the left upper extremity" (Tr. 22).

5. Martin "is capable of performing past relevant work as a press operator, light unskilled, as the vocational expert testified. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity" (Tr. 27).

6. "Alternatively, . . . the vocational expert testified there are jobs existing in significant numbers in the national economy that the claimant could perform. Therefore, a finding of 'not disabled' is likewise appropriate under the framework of Medical-Vocational Rule 202.18." [4] (Tr. 27)

---

[4] The Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2 are a set of tables used for determining whether an individual with exertional limitations is disabled. Rule 202.18 indicates that a younger individual with a limited education who previously performed skilled or semiskilled labor, and who is now limited to performing light work, is not disabled.

"Where a claimant does not suffer from nonexertional impairments or where such impairments 'do not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities,' the Commissioner may conduct this inquiry by consulting the Medical–Vocational Guidelines (the Grids). *Collins v. Astrue,*     F.3d    , 2011 WL 3444564, at *1 (8th Cir. 2011)* (quoting *Ellis v. Barnhart,* 392 F.3d 988, 996 (8th Cir.2005)). "However, 'where the claimant suffers from a nonexertional impairment such as pain, the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical–Vocational Guidelines.'" *Id.* (quoting *Baker v. Barnhart,* 457 F.3d 882, 894 (8th Cir.2006)).

### B.  Statement of Issues

Martin challenges the ALJ's findings set forth in paragraphs 4, 5, and 6 above. In particular, he argues that the ALJ's decision is contrary to law and not supported by substantial evidence because:

      1.     If correctly identified, [Martin's] past relevant work as a press operator lies beyond his residual functional capacity as found by the ALJ;

      2.     The analysis and finding as to his residual functional capacity are incomplete and based on an incorrect legal standard;

      3.     The discounting of [Martin's] credibility is not supported by substantial evidence and relies on use of an incorrect legal standard; and

      4.     The pertinent hypothetical question [the ALJ posed to the vocational expert] failed to address material issues and so is legally deficient.

(Filing 20 at 3)

Basically, Martin argues that (1) the press operator job was performed at the medium exertion level, (2) the ALJ did not properly assess Martin's ability to function in the workplace, (3) the ALJ did not address Martin's claim that he is limited in the ability to reach forward, and (4) the hypothetical question did not include several additional limitations.  The Commissioner effectively concedes the first point but disputes the rest, arguing that the ALJ made a proper RFC assessment, implicitly rejected the forward-reaching limitation, and included in the hypothetical question all limitations that were supported by the evidence.

### C. Statement of Facts

In July 2004, ten months after his alleged onset date, Martin presented to emergency room physician Craig Bartruff, M.D., with complaints of pain in his hips and legs (Tr. 210). Martin told Dr. Bartruff that he was working 12-hour days for a sand and gravel company (Tr. 210). On examination, Martin could rotate his hips and flex his knees without difficulty (Tr. 210). Straight-leg raises were also negative, and Martin had no problem with heel-toe walking (Tr. 210). Martin, however, reported general tenderness in his lumbosacral region (Tr. 210). Dr. Bartruff assessed general inflammation with secondary spasm, prescribed pain medication, counseled Martin on proper back care, and reassured him that "things seemed good at this point" (Tr. 210).

Later that month, Martin saw chiropractor Gary Nielsen, D.C. (Tr. 218, 296-98). He said that his back and hips hurt if he walked or stood for too long (Tr. 296). At that time, the chiropractor wrote that Martin was unable to perform "physical labor due to his low back condition" (Tr. 215).

In August 2004, Martin presented to Toby Free, M.D., with complaints of low back pain that caused him to stop working (Tr. 226). On examination, Martin walked without difficulty, although straight-leg raises were positive for pain (Tr. 226). Dr. Free also noted that earlier x-rays from Martin's chiropractor revealed some mild scoliosis and spondylolisthesis at L4 (Tr. 226).

Later that month, Martin presented to Ramon Salumbides, M.D., with complaints of back pain that radiated to his hips (Tr. 207). He stated that his pain worsened with prolonged standing, walking, sitting, lying down, excessive lifting, and repetitive bending (Tr. 207). On examination, Martin reported tenderness in his low back, but his gait appeared normal, straight-leg raises were negative, and he had full range of motion in his back and rotation in his hips (Tr. 208). A lumbar spine MRI revealed "some slight central bulging" at L4-L5, and spondylolisthesis, stenosis, and

bulging at L5-S1 (Tr. 208, 213-14). Dr. Salumbides opined that Martin's pain stemmed from the spondylolisthesis at L5-S1; he believed that surgery would be required eventually (Tr. 208).

That same month, in August 2004, Martin completed a Daily Activities and Symptoms Report in connection with an earlier disability application (Tr. 113-19). In this report, Martin wrote that he cooked meals three times daily (Tr. 113). He also indicated that he could wash dishes, do laundry, and clean the house, although he needed to take breaks during these activities (Tr. 113). Martin said he could sit for "quite a while" before he started cramping, but that he could stand for only 15 minutes before his legs hurt (Tr. 114). He wrote that he had pain "all day and night" in his back, hips, and legs, and that his pain ranged from a 5/10 (good days) to 10/10 (bad days) (Tr. 115).

In late September 2004, state agency reviewing physician Glen Knosp, M.D., opined that Martin's back impairments limited him to lifting 20 pounds occasionally and 10 pounds frequently, and sitting, standing, and walking six hours each in an eight-hour workday (Tr. 230-37). Dr. Knosp further opined that Martin was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling; he did not believe Martin had any reaching limitations (Tr. 232-33).

In November 2004, Martin presented to Daniel Tomes, M.D., for surgery on his low back (Tr. 249, 254-56). Martin had no complications with the surgery; he reported having "very good control of pain," and walked without difficulty within a couple days after the surgery (Tr. 249). Dr. Tomes told Martin to return in four weeks and that, in the interim, he could walk as tolerated but should limit his bending, twisting, and lifting to less than 15 pounds (Tr. 249). Dr. Tomes also provided Martin prescriptions for Lortab and Flexeril to use as needed for pain (Tr. 250).

Two months later, in January 2005, Martin presented to Rachelle Kaspar-Cope, M.D., for follow-up on his back surgery (Tr. 288). He reported that he was "really

doing quite well," that he felt "like he [was] back to his old self," that he had been active in physical therapy, that he was "walking every day," and that he was "generally feeling quite good" (Tr. 239, 288).

In April 2005, Martin saw Craig Svoboda, M.D., for evaluation of his back pain (Tr. 286). He reported that he could not control his pain with Motrin and requested prescription pain medication (Tr. 286). Martin also stated that he had been "trying to get a job" but no employer would hire him "once they [got] his medical history" (Tr. 286). Dr. Svoboda prescribed Ultram and recommended a TENS unit and physical therapy (Tr. 286).

In May 2005, Martin returned to Dr. Kaspar-Cope with complaints of a headache that radiated into his neck (Tr. 267). On examination, Martin's neck was tender but he was otherwise neurologically intact and walked normal (Tr. 267). Dr. Kaspar-Cope administered Toradol and Phenergan and told Martin to return if problems persisted (Tr. 267).

Several months later, on September 15, 2005, Martin returned to Dr. Svoboda with complaints of worsening low back pain (Tr. 285). On examination, Martin had mild-to-moderate tenderness in his back (Tr. 285). Although he limped and said his left leg was stiff, he walked independently (Tr. 285). Dr. Svoboda assessed low back pain with sciatica, prescribed pain medication, and recommended physical therapy (Tr. 285). Martin declined a physical therapy referral (Tr. 285).

Five days later, Martin saw Dr. Tomes with left leg pain (Tr. 292). Martin remarked, however, that he had no pain in his right leg and low back (Tr. 292). Martin said he doing some home remodeling, and that he was "quite active with that and [had] been able to undertake a full work routine without difficulty" (Tr. 292). On examination, Martin had good muscle tone, muscle bulk, and muscle strength throughout his legs (Tr. 292). Dr. Tomes recommended a CT myelogram to help evaluate the underlying cause of Martin's pain (Tr. 292). In a letter to Dr. Svoboda

-8-

following the examination, Dr. Tomes noted that treatment might include injections, medication, or physical therapy, although he noted that Martin previously had been "very much delinquent in his attendance" with physical therapy (Tr. 293).

On September 30, 2005, Martin protectively filed his applications for Social Security benefits (Tr. 18).

In November 2005, Martin saw Lennie Deaver, M.D., and Tim Yrastorza, P.A.-C, on two occasions with complaints of left leg pain that radiated from his back (Tr. 291, 366). Significantly, Dr. Deaver noted during his examination that Martin walked without any limping and could get on and off the table (Tr. 366). Similarly, although Martin reported that he could not walk ten feet without severe pain, Yrastorza observed him leaving the clinic with no signs of a limp (Tr. 291). A CT myelogram showed satisfactory healing of his fusion with no evidence of pain (Tr. 291).

That same month, chiropractor Nielsen wrote that he had treated Martin for a brief time in 2004 for back pain but that Martin declined further treatment (Tr. 298). The chiropractor remarked that it was hard to ascertain Martin's condition because he did not complete the program (Tr. 297).

The following month, in December 2005, Martin saw W. Suleiman, M.D., with complaints of persistent back pain that radiated into his hips and left leg (Tr. 294). Martin said that sitting was his "best position, then standing, and then laying down" (Tr. 294). Martin said he could not walk more than 30 feet without severe pain (Tr. 294). On examination, Martin walked with a "slightly antalgic gait, favoring the left leg" (Tr. 294). He also had a slightly decreased range of motion in his back, but otherwise he had full range of motion in all major and minor joints (Tr. 294). Dr. Suleiman administered a left sacroiliac joint injection and prescribed physical therapy (Tr. 294). He also told Martin that he expected his condition to improve, and he

encouraged Martin "to be active, and to walk briskly," gradually building up to 40 minutes daily (Tr. 294).

In January 2006, Martin presented to Scott Smith, M.D., with complaints of left leg pain and weakness (Tr. 300). Dr. Smith noted that Martin's most recent myelogram was unremarkable (Tr. 300). After an examination revealed no abnormalities, Dr. Smith prescribed Lyrica (Tr. 301). Two months later, when seeking treatment for a headache, Martin admitted that he had been working on a house when a piece of ceiling plaster fell and hit him on the head (Tr. 360, 366).

In March 2006, state agency physician Dr. Knosp completed a second record review. (Tr. 318-325). He opined that Martin could lift 20 pounds occasionally and 10 pounds frequently, and sit, stand, and walk six hours in an eight-hour workday (Tr. 319). Dr. Knosp further opined that Martin could occasionally balance, stoop, kneel, crouch, and crawl, and that Martin had no reaching limitations (Tr. 320-21). In May 2006, P. Grossman, M.D., affirmed Dr. Knosp's opinion (Tr. 317).

Approximately one year later, in April 2007, Martin presented to Cambridge Memorial Hospital with complaints of pain in his chest, left arm and back (Tr. 355). On examination, Martin's heart rate and rhythm were normal, his lungs were clear, and he had full range of motion in his left arm (Tr. 355). After a chest x-ray revealed no abnormalities, Dr. Kaspar-Cope assessed atypical chest-back-arm pain and administered morphine for pain relief (Tr. 355). A cervical spine MRI performed later that month also revealed no abnormalities (Tr. 382).

In August 2007, Martin saw David Huebner, M.D., for treatment of his right leg (Tr. 404). He reported that he had broken his leg two weeks earlier while visiting his brother in Louisiana, and that he had been on non-weight bearing on crutches since that time (Tr. 404). On examination, Martin appeared well-developed and in no apparent distress (Tr. 404). He also had full strength in all muscle groups (Tr. 404).

-10-

X-rays confirmed a spiral fracture in the distal tibia (Tr. 404). Dr. Huebner continued Martin with his cast and crutches and told him to follow-up in two weeks (Tr. 404).

In September 2007, Martin returned to Dr. Huebner for evaluation of his right leg (Tr. 402). He said that he was "doing well" other than some pain in his right calf and ankle (Tr. 402). On examination, Martin had some limited range of motion in his right ankle due to stiffness (Tr. 402). Dr. Huebner recommended a short leg cast as he continued to work on weight bearing (Tr. 402).

Several months later, in June 2008, Martin presented to the Kearney Orthopedic Clinic with complaints of right arm pain (Tr. 370). On examination, Martin had full extension and flexion in his right arm and right shoulder (Tr. 370-71). X-rays of his right arm, elbow, and shoulder were negative (Tr. 369, 373-74), and a right arm nerve conduction study was also normal (Tr. 378). Chris Wilkinson, M.D., assessed possible tendinitis and prescribed Ultram (Tr. 371).

In September 2008, Martin, his attorney, and a vocational expert appeared for a video hearing (Tr. 434-75). Martin testified that he lived with his wife, his 11-year-old son, and 2-year-old grandson (Tr. 438-39). He testified that his back pain worsened after his surgery, that he had daily pain in his low back that worsens with walking, kneeling, and lifting, and that his legs "give out" at times (Tr. 441-42). Martin testified that he had tried physical therapy, a TENS unit, and pain medication in the past, but that he was not currently taking any pain medication (Tr. 442-43). He testified that he also has constant but not intense pain in his shoulders (Tr. 444). Martin said that he helped his wife care for his son and grandson (Tr. 446). He said he could not lift his grandson but he could change his diaper, that he helped with the house cleaning and fixed meals, and that he mowed the lawn with a push mower (Tr. 446-47). Martin testified he could lift 25 pounds comfortably, and sit 4 hours and stand and walk 2 hours each during an eight-hour day (Tr. 449-51). He said his shoulders hurt with both overhead and forward lifting (Tr. 451).

-11-

The ALJ asked the vocational expert to consider a hypothetical claimant of Martin's age, education, and work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently, and sit, stand, and walk six hours each in an eight-hour workday (Tr. 468). The claimant could not climb ropes, ladders, and scaffolds, and could only occasionally balance, climb ramps and stairs, and perform overhead reaching with his left arm (Tr. 468). The vocational expert responded that such a claimant could perform Martin's past relevant work as a press operator (Tr. 468). In addition, the vocational expert testified that such a claimant could perform "light" exertional work as a meat cutter, hand packer, and a production line solderer. The vocational expert clarified that these jobs would not be precluded even if the claimant was limited to occasional overhead reaching with both arms, but that all of the identified jobs would be precluded if the claimant could not perform at least frequent forward reaching (Tr. 469-70).

## II.  DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted).  Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion.  *See id.*

Questions of law, however, are reviewed de novo.  *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n2 (8th Cir. 1995). Legal error may be an error of procedure, *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003), the use of erroneous legal standards, or an incorrect application of the law, *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983).

### A.   Residual Functional Capacity

A claimant's residual functional capacity ("RFC") represents the most he can do despite the combined effect of his credible limitations. *See* 20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for assessing a claimant's RFC based on all the relevant evidence, including the claimant's description of his limitations, the medical records, and observations of the claimant's physicians and others. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). In making this assessment, the ALJ has discretion to discredit a claimant's self-reported limitations if he determines they are inconsistent with the record based on his evaluation of the relevant factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and 20 C.F.R. §§ 404.1529, 416.929. Such factors include the claimant's prior work records; observations by third parties and physicians regarding the claimant's disability; the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medications; and the claimant's self-imposed functional restrictions. *See Polaski*, 739 F.2d at 1322.

Although the RFC is a medical question, an ALJ's RFC findings need not be directly tied to a specific medical opinion in the record. Rather, the ALJ has the duty to determine a claimant's RFC based on all the relevant, credible evidence of record. *See Ellis*, 392 F.3d at 994 ("[A]lthough medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner."); *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (ALJ must determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); *cf. Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (RFC is a determination based on all the evidence but the record must include some medical evidence to support the RFC finding).

The ALJ found that Martin's back and shoulder impairments "cause significant limitation in the claimant's ability to perform basic work activities." (Tr. 20) He also

found that Martin "has nonsevere impairments including Hepatitis C, visual problem, and leg fracture." (Tr. 20) According to the ALJ, Martin "denied any problem arising from Hepatitis C, and he has only mild amblopia of eye with minimal functional limitation (Exhibit 22F, p. 1). The claimant's right leg injury occurred in August, 2007 (Exhibit 28F), at which time he rented a wheelchair probably to elevate right tibia pilon fracture (Exhibit 27F, pp. 17-18). However, he has received no further treatment since September 7, 2007 and there is no evidence of problems with healing (Exhibit 28F). Accordingly, these impairments would have no more than a minimal effect, if any, on the claimant's ability to engage in basic work-related activities (SSR 96-3p)." (Tr. 20-21) Martin does not dispute these findings.

"As to a possible psychiatric impairment," the ALJ "note[d] the claimant is not undergoing any regular and ongoing treatment for depression and anxiety though he does have a prescription for Klonopin. In an Initial Assessment/Treatment Plan dated March 6, 2006, Dr. Johnson assessed the claimant's Global Assessment of Functioning (GAF) as 68, which the *DSM IV-TR* defines as some 'mild' symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. Dr. Johnson further advised the claimant 'has absolutely no symptoms of depression' (Exhibit 23F)." (Tr. 21) Accordingly, the ALJ found that "the claimant's depression and anxiety (Exhibit 17F, p. 5), considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." (Tr. 21) The ALJ further explained:

> In making this finding, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

> The first functional area is activities of daily living. In this area, the claimant has no limitation (he fixes breakfast, does light housecleaning, watches television and listens to the radio—what

-14-

limitations he has in this area he attributes to physical problems). The next functional area is social functioning. In this area, the claimant has no limitation (the claimant relates no particular problem getting along with people). The third functional area is concentration, persistence or pace. In this area, the record establishes no evidence of limitation. The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation (*see*, Exhibit 25F, p. 12). Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, they are nonsevere (20 CFR 404.1520a( d)( 1) and 416.920a(d)(1 )).

(Tr. 21) Again, Martin does not dispute these findings.

In making a finding of Martin's residual functional capacity, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 (incorporating and expanding upon *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984); SSR 96-4p; SSR 96-7p." (Tr. 22) The ALJ also claimed to have "considered the opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927, and SSRs 96-2p, 96-5p, 96-6p and 06-3p."  (Tr 22) Martin charges, however, that the ALJ failed to comply with Social Security Ruling (SSR) 96-8p by assessing his residual functional capacity "for work activity on a regular and continuing basis." [5]

I find no merit to Martin's argument. In his decision, the ALJ correctly stated that "an individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments"

---

[5] This ruling emphasizes that "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (Social Security Administration, July 2, 1996).

(Tr. 19) and also that Martin would be considered not disabled if he had the RFC to return to his past relevant work or perform other work existing in significant numbers (Tr. 20). In the RFC assessment, as well as in the hypothetical question posed to the vocational expert, the ALJ specifically discussed Martin's RFC in the context of an eight-hour workday (Tr. 22, 468). There is no indication that the ALJ failed to assess Martin's "ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted).

Although Martin asserts that the ALJ's decision does not contain an adequate discussion of his ability to perform sustained work activities, I conclude that it does. The ALJ first summarized Martin's testimony given on September 8, 2008:

> The claimant testified he lives in a mobile home with his wife, 11-year-old son and 2-year-old grandson. He said his wife does not work. He stated he receives Medicaid and Food Stamps. He is 5'4" and weighs 159-160 pounds, is right handed, completed the 10th grade, and has not since acquired any additional formal education or vocational training. The claimant testified further he worked for a road construction crew from July 25-27, 2004. He alleges he is incapable of working as a

-16-

result of a back problem, status post lumbar fusion in 2004. He claims his condition has worsened since undergoing surgery. He stated he has low back pain in the mid back which is aggravated by walking and kneeling. He alleges he cannot move, and his wife has to help him daily. Mr. Martin additionally testified he was on pain pills, but got sick and now tries to stay away from them. He said he has tried hot/cold packs, a TENS unit, physical therapy, and chiropractic manipulations, but nothing helped. The claimant described he also has shoulder problems, and is status post left shoulder surgery which was somewhat helpful, but he still has pain everyday in both shoulders. He stated he has received no treatment for Hepatitis, and does not think it is problematic. Mr. Martin related he has headaches 1-2 times a month which last a couple of days each time, and rates his pain as 10 (1-10 scale). Mr. Martin also testified he has an elbow problem but is lacking a diagnosis, and was told he might need surgery. He said he also has a broken ankle. As to his activities of daily living, the claimant testified he gets up at 6 a.m., and his wife helps him get out of bed. He is able to manage personal grooming, and both he and his wife take care of 2-year-old grandson, and he changes his diapers. Mr. Martin stated he cannot vacuum or empty the trash, and it takes him longer to do the dishes. He said he could mow the lawn with a push mower. He related he enjoys collecting things such as motorcycle toys, finger rings, Dale Earnhardt memorabilia, etc. He said he attended church before his granddaughter died, watches TV for 5-6 hours, and does not attend movies. Mr. Martin reported he could lift 25 pounds comfortably, stand 2 of 8 hours (30 minutes at one time), walk 2 of 8 hours (30 minutes at one time), sit 1 hour at one time and a total of 3-4 hours in an 8-hour day, cannot bend or stoop, and sits on a chair with legs pulled up to tie shoes. He alleges he has pain with reaching in front and above shoulders.

In response to questioning by his representative, the claimant testified he cannot lift 25 pounds all day, but rather ½ hour at one time, stand ½ hour and then has to rest, walk ¼ mile per day with 2 breaks, and can sit an hour but has to stand and/or walk around 10 minutes before he can sit again. He stated he ended up in the emergency room when he attempted to work in July, 2004. Mr. Martin also testified he had to lift at least 50-60 pounds on a construction job. He stated he has worked as a laborer/roofer and had to lift l00+ pounds daily. The

-17-

> claimant described he now takes medication for anxiety. He alleges he
> cannot perform his previous jobs due to back problems. He related he
> tried to fix a hole in the house, and ended up in bed for 3 days. He
> testified he could no longer do housework. Mr. Martin stated he is
> mainly at home, although he visits his mother who lives in front of him.

(Tr. 22-23) The ALJ next detailed Martin's medical history, providing appropriate
references to the record, and concluded that "the claimant's medically determinable
impairments could reasonably be expected to produce the alleged symptoms; however,
the claimant's statements concerning the intensity, persistence and limiting effects of
these symptoms are not credible to the extent they are inconsistent with the residual
functional capacity assessment . . .. (Tr. 23-26) The ALJ further explained:

> The claimant's testimony is not credible to the effect he is totally
> precluded from all sustained work activity. None of the physicians of
> record has expressed the opinion that he is totally disabled or incapable
> of working.  Nor did they advise him against substantial gainful activity.
> Even after back surgery upon discharge from the hospital he was advised
> not to lift more than 15 lbs, limit bending and twisting at the waistline
> and ambulate as tolerate[d] during the recovery period. Such limitation
> alone would no[t] preclude lighter work.[6] Moreover, despite allegations
> of disabling pain, the claimant currently takes no medication [to] relieve
> pain, for fear of addiction he states. He has tried other treatment
> modalities but was described as very much delinquent with physical
> therapy attendance (Exhibit 18, page 2) and continued smoking against
> medical advice while recovering from fusion surgery (Exhibit 17F).
> Following surgery a CT myelogram showed satisfactory healing of inter
> body fusion. By September, 2005, he had had a good recovery and was
> described by his doctor as working full time in the remodeling business.
> He is not a candidate for additional surgery. Also noteworthy is the

---

[6] Martin notes that "in response to a hypothetical question based largely on
those restrictions as interpreted by the ALJ, the VE [vocational expert] restricted
remaining candidate jobs to sedentary work (Tr. 471-472)." (Filing 20 at 15-16) The
VE testified that a person with these restrictions would be able to work, for example,
as a food and beverage order clerk, assembler, or hand laborer (Tr. 472)

observation at Exhibit 18F, page 2 that although he alleged he could not walk more than 10 feet without experiencing severe pain, he was observed to walk about 50 feet without a sign of a limp (Exhibit 18F, p. 2). When seen at the hospital feeling dizzy and drowsy he had injured himself working on the house when he was hit by a piece of ceiling plaster. At the hearing he changed his testimony with respect to his functional capacities upon cross examination by his representative.[7] Although Mr. Martin alleges right shoulder problems, an extensive workup in this regard was essentially negative.[8] I also note he engages

_____

[7] Regarding his "changed testimony," Martin states that there was a difference in some of the questions being asked: "Some of the ALJ's questions, such as the one at Tr. 449 about lifting ["[H]ow much do you feel you can lift comfortably?], seemed to address one-time events or events separated by unknown periods of rest or undesignated posture. The representative's questions tended more toward capacities for a full day or events done in sequence. . .. Thus, Martin can lift 25 pounds comfortably (Tr. 449) but cannot do so throughout an eight-hour shift (Tr. 452)." (Filing 20 at 17) In response to his attorney's questions, though, Martin testified he could lift 25 pounds at intervals throughout an 8-hour day; Martin also stated he could pick up and hold a 25 pound weight for a half hour at a time, or for 15 to 20 minutes if he was moving it (Tr. 452). The ALJ determined that Martin has the residual functional capacity to lift and carry 20 pounds occasionally (*i.e.*, "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous) (Tr. 318)) and 10 pounds frequently (*i.e.*, occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous) (*id.*)) (Tr. 22).

[8] Martin complains that the ALJ "points to nothing in that work-up which tests the shoulder by the kind of repeated motion against resistance which it would encounter in the lifting which defines light work under 20 C.F.R. 404. 1567(b). The ALJ points to no medical evidence that the radiographic testing in question is diagnostic for the right shoulder's condition when that joint is placed under such stress. Where resistance testing was tried, it produced the finding that Martin 'has pain on resistance to right elbow flexion and forearm supination' (Tr. 371)." (Filing 20 at 17) Significantly, Martin does not dispute the ALJ's statement that the results of the medical exam were "essentially negative." As described by the ALJ, the workup regarding Martin's complaints of right arm pain revealed the following:

The claimant was also evaluated on June 18, 2008, in reference to a

in a wide range of age-appropriate activities not fully consistent with his allegation of disability. For example, he is independent in self-care activities, mows the lawn with a push mower, collects Dale Earnhardt memorabilia and miniature motorcycles, watches movies everyday, goes outside and visits others 2 times a week, is visited by others 2 times a week, adjusts to changes, cooks 5 days a week, assists with the supervision of 1 child for 2-3 hours daily, handles his own money, gets along well with employees and handles criticism well, cares for pets, and is able to concentrate and maintain attention (Exhibits 9E-l0E/ Testimony). While in themselves these activities are no[t] proof of work capacity, they do tend, in combination with the other factors noted above, to suggest that the claimant is not in as much pain as he claims and is not as functional[ly] limited as parts of his testimony would indicate. Accordingly, for all of the above and foregoing, I find the above residual functional capacity assessment is supported by the medical findings and assessments as discussed herein.

As for the opinion evidence, the State agency found the claimant had no severe mental impairment(s) (Exhibits 7F, 25F), and that he retained the residual functional capacity for light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and should avoid concentrated exposure to vibration and hazards (Exhibits

---

complaint of right arm pain. Pertinent examination revealed full extension and full flexion of the elbow. He seemed to have either a divot or a prominence at the distal biceps tendon. There was tenderness over the lacertus fibrosis. The claimant had full range of motion in his right shoulder and was non-tender about his right shoulder. He had pain on resistance to elbow flexion and forearm supination (Exhibit 27F, pp. 8-9). X-ray of the right humerus showed no fracture, dislocation, or other active process (Exhibit 27F, p. 14). Films of the right shoulder showed no fracture, dislocation, or bone destruction. There was minimal degenerative change at the AC joint. There was no definitive active process (Exhibit 27F, p. 13). A nerve conduction study of the right upper extremity was normal (Exhibit 27F, p. 16). An MRI of the right elbow, June 22, 2008, was within normal limits (Exhibit 27F, p. 12).

(Tr. 25)

12F, 24F). I afford significant weight to these assessments as they are consistent with the record as a whole

(Tr. 26)

Martin argues the ALJ's finding that his testimony was "not credible to the effect he is totally precluded from all sustained work activity" shows that the ALJ erred as a matter of law because he did not state that the "sustained work activity" needs to be "substantial" and "gainful." *See* 42 U.S.C. § 1382c(a)( 3)(A) ("[A]n individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . ..."); 20 C.F.R. §§ 404.1510, 416.910 ("Substantial gainful activity" means work that (a) involves doing significant and productive physical or mental duties and (b) is done (or intended) for pay or profit). *See also* 20 C.F.R. §§ 404.1572, 416.972 (defining "substantial" and "gainful"). Martin argues that the ALJ required him "to prove that he could not, for example, do 'sustained' volunteer or other unremunerative work." (Filing 20 at 9) This argument is baseless. The ALJ found at step one that Martin had not engaged in substantial gainful activity since the alleged disability onset date, and found at step five that he could work as a meat cutter, hand packager, and solderer-assembler (Tr. 27).

Martin also objects that the ALJ's reference to "*all* sustained work activity" shows that he failed to apply the correct legal standard because "[a]t step four, Martin has the burden of proof not as to 'all' work but only as to his past relevant work," and "[a]t step five, the Commissioner, in carrying his burden of going forward, may not draw upon 'all work' but is, instead, restricted to work for which Martin is vocationally qualified . . . and which his RFC would permit him to do full-time . . .." (Filing 20 at 9-10) Again, this argument is baseless – the ALJ's decision makes clear that the correct legal standards were applied at steps four and five.

-21-

Martin also takes issue with the ALJ's reliance upon the fact that none of the physicians had expressed the opinion that he is incapable of working or advised him against substantial gainful activity. If a physician is not asked to assess a claimant's ability to work, his silence on this question cannot be used as substantial evidence the claimant is not disabled. *See Pate-Fires v. Astrue*, 564 F.3d 935, 943-44 (8th Cir. 2009) (citing *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir.2001); *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir.2001)). *But cf. Young*, 221 F.3d at 1069 ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work."). On the other hand, the lack of any significant restrictions imposed by Martin's doctors is inconsistent with his complaints of disabling pain. *See Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993).

Martin next objects that the ALJ "does not explain why even an ability to walk 50 feet without a limp [after leaving the doctor's office] implies an ability to stand or walk for six hours per shift, five days a week, on a regular and continuing basis." (Filing 20 at 16) The significance of this evidence, obviously, is that the physician's assistant who observed Martin walking believed that he had been untruthful when he reported that he could not walk more than 10 feet without experiencing severe pain. The ALJ's consideration of the evidence was therefore proper. "The ALJ must first evaluate the claimant's credibility before determining a claimant's RFC." *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

As further evidence that Martin's complaints of pain were not fully credible, the ALJ noted that he engaged in a "wide range" of daily activities. Martin argues that the ALJ did not adequately develop the record in this area, and that without more information concerning the nature and extent of his activities the evidence is not relevant. For example, when asked if he was able to use the push mower, Martin responded, "Not very well. Not without lots of breaks." (Tr. 447) Given this response, Martin argues that the ALJ should have asked follow-up questions:

The ALJ made no inquiry concerning the number and duration of breaks required within a given period of attempted mowing and so had no way to compare these efforts with the demands of full-time, competitive light work. The size of the area mowed, the time required to finish the job and the effect (if any) oft [sic] effort on Martin's symptoms were not addressed by the ALJ.[9] Besides, mowing is seasonal; and even during the season it does not need to be done every day. In short, the attempted mowing, without the missing information, is in no way inconsistent with an allegation of inability to sustain full-time work. Nor does it support the ALJ's finding that Martin can sit six hours per shift or spend six hours per shift on his feet (Tr. 22, Finding 5). Since the mowing provides no evidence relevant to measuring Martin's RFC, it should not have been used to do so or to discredit his testimony.

(Filing 20 at 11)  Martin's ability to mow his lawn with a push mower, even though he may not be able to do it very well, clearly is relevant to the question of credibility. *See, e.g., Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009)* (claimant's reported activity level, including occasional lawn mowing, was inconsistent with allegations of disabling pain).  The ALJ states in his decision that this activity and Martin's other activities of daily living "are no[t] proof of work capacity, [but] they do tend, in combination with the other factors . . . to suggest that the claimant is not in as much pain as he claims and is not as functional[ly] limited as parts of his testimony would indicate." (Tr. 26) This is a correct application of the law.  "Although daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain." *Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).*

While Martin devotes much of his brief to a discussion of the ALJ's listing of his activities of daily living, the ALJ does not appear to have placed undue reliance upon those activities in discounting Martin's complaints of pain. Even assuming that the ALJ should have asked Martin more questions, *see, e.g., Dixon v. Barnhart, 324 F.3d 997, 1002 (8th Cir. 2003)* (ALJ erred in relying upon statements that claimant

---

[9] Martin has not answered these questions in his post-hearing affidavit, either.

engaged in daily life activities of driving, gardening, mowing, shopping, and reading to discredit treating physician's opinion where record pertaining to claimant's daily activities was not fully developed), Martin "must show both a failure to develop necessary evidence and unfairness or prejudice from that failure." *Combs v. Astrue*, 243 Fed.Appx. 200, 204, 2007 WL 2174555, at *4 (8th Cir. 2007) (citing *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001)). *See also Ellis*, 392 F.3d at 994 (rejecting argument that ALJ failed to develop record where no unfairness or prejudice shown); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) ("[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.") Martin has not made the required showing of unfairness or prejudice.

"The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir 2007) (quoting *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004)). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." S.S.R. 96-8p, 1996 WL 374184, at *1 (Soc. Sec. Admin. July 2, 1996). Physical demands of work include "sitting, walking, lifting, carrying, pushing, pulling, . . . [and] manipulative or postural functions, such as reaching, handling, stooping or crouching . . . ." 20 C.F.R. §§ 404.1545(b), 416.945(b).

Martin contends the ALJ failed to give adequate consideration to the function of "reaching." The ALJ found that Martin can "perform not more than occasional overhead reaching with the left upper extremity" (Tr. 22),[10] but Martin claims he is

---

[10] In August 2002, Martin suffered a fractured dislocation of his left shoulder (Tr. 212, 227, 280). In January 2003, he underwent arthroscopic surgery and repair of the left shoulder (Tr. 211, 280). The surgeon, Richard Slovek, M.D., found in

also limited in his ability to reach forward with both arms.  Martin did not mention any problem with his shoulders in the disability report filed in conjunction with his 2005 applications,[11] but at the hearing the following exchanges occurred:

> Q [by the ALJ]  Okay.  Other than the back, what other issues do you have?
> A [by Martin]  I have shoulder problems.
> Q  Right or left?
> A  Both, but I had surgery on my left shoulder, orthoscopic [sic] surgery on my left shoulder.
> Q  What did you have surgery for?
> A   Because I completely, how, how do they put that?   Not dislocated but I completely separated by shoulder.
> Q  Did the surgery help?
> A  Some. But it just now, it's, just a constant pain every day.  It's not an intense one, but it's there every single day.
> Q  How about the right shoulder?
> A  It's, it's just a dull pain, too, every single day.
> . . .
> Q  Was it the same problem as the left shoulder?
> A  [INAUDIBLE].  No I hadn't separated it.  It's just, I have no idea what it is actually.  Right now I'm supposed to be going to Dr. Wilkerson [sic] to figure out what's going on there.
> . . .
> Q  Since you're having problems with you shoulder, how often can you reach overhead?
> A  Not very often at all.
> Q  How about straight in front of you?
> A  It's about the same. No, it hurts. It's burning sensations.
> Q  Is that same with both shoulders?

---

February 2003 that Martin was "doing well" and would be able to return to construction work the following month (Tr. 211).

[11] Martin listed only "Back and eye problems & hepatitis c" and stated, "I can hardly walk and I cant [sic] walk far distances.  I cant [sic] bend, I walk with a limp. I have pain in my back and I get a shooting pain in my left leg." (Tr. 141)

       A  Yes, sir. Just more in my left than my right. But it's about, it's the same. I get the same sensation.

(Tr. 443-44, 451)

When Chris Wilkinson, M.D., examined Martin on June 18, 2008, about three months before the hearing, he had "full range of motion in his right shoulder and [was] non-tender about his right shoulder."  (Tr. 370-71) Radiographs of the right shoulder also found "no bony injuries or abnormalities about the shoulder" and "no significant loss of acromiohumeral distance."  (Tr. 369) In short, the right shoulder was "unremarkable."  (Tr. 369, 371)

At the hearing, the ALJ posed an alternative hypothetical question to the vocational expert which asked her assume an individual who "[c]an only occasionally up to one-third of the day reach overhead or in front of his body or out to the side." (Tr. 472) The VE testified that such a limitation on forward reaching would prevent the individual from performing any work (*id.*).

The ALJ referenced Martin's testimony in his decision, stating: "The claimant described he also has shoulder problems, and is status post left shoulder surgery which was somewhat helpful, but he still has pain everyday in both shoulders. . . . He alleges he has pain with reaching in front and above shoulders."  (Tr. 22-23) Although the ALJ did not specifically explain why he rejected Martin's claim that he is limited in he ability to reach forward, it is apparent from the ALJ's decision, and from the alternative hypothetical question posed at the hearing, that he considered the claim in accordance with the function-by-function approach required by SSR 96-8p.

The situation is  similar to that presented in *Depover v. Barnhart*, 349 F.3d 563 (8th Cir. 2003), where the ALJ did not make specific RFC findings regarding the claimant's ability to sit, stand, and walk.  The Court of Appeals held this was not reversible error, stating:

[The ALJ] made explicit findings [regarding certain physical functions] and, although we would have preferred that he had made specific findings as to sitting, standing, and walking, we do not believe that he overlooked those functions. We think instead that the record reflects that the ALJ implicitly found that Mr. Depover was not limited in these areas: We note initially that all of the functions that the ALJ specifically addressed in the RFC were those in which he found a limitation, thus giving us some reason to believe that those functions that he omitted were those that were not limited. Furthermore, at the hearing, the ALJ first posed a hypothetical question to the vocational expert that included the RFC that he (the ALJ) found. After the expert concluded that Mr. Depover could perform his past relevant work as a sporting goods sales clerk or a cashier/checker, the ALJ asked him an alternative hypothetical question that included the limitations on sitting, standing, and walking to which Mr. Depover had testified at the hearing. We note, also, that in his decision the ALJ noted that Mr. Depover had testified that he could not do his past work because he could not stand for long periods. Therefore it appears to us that the ALJ did not simply overlook the possibility that Mr. Depover was limited with respect to sitting, standing, or walking when he stated his RFC. Having carefully reviewed the record, we believe that the ALJ implicitly found that Mr. Depover was not limited in these functions, and in this instance we do not see any reason to remand to make the findings explicit.

*Id*. at 567-68.

In summary, the ALJ made proper assessments of Martin's credibility and residual functional capacity, and there is substantial evidence to support the ALJ's findings.  I must next determine whether there is substantial evidence to support the ALJ's findings that Martin's RFC permits him to perform past relevant work or other work that exists in significant numbers in the national and regional economies.

-27-

### B.  Step Four

The ALJ determined at step four of the evaluation process that "[t]he claimant is capable of performing past relevant work as a press operator, light unskilled, as the vocational expert testified."  (Tr. 27)[12]  Martin claims this finding was erroneous because he indicated in responding to questionnaires that the job constantly required him to bend and crouch, frequently required him to lift and carry 50 pounds or more, and also required him to stand or walk for 8 hours a day, with no sitting (Tr. 96, 138-39).[13]  Martin's RFC, as determined the ALJ, only permits him to stoop and crouch occasionally, lift 10 pounds frequently, and stand or walk for 6 of 8 hours (Tr. 22).

When evaluating whether a claimant can return to past work, the ALJ "must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity. The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work. Then, the ALJ should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks. A conclusory determination that a claimant can perform past work without these findings, does not constitute substantial evidence that the claimant is able to return to his past work."

---

[12] The ALJ found that Martin is unable to perform his other past relevant work because "[t]he vocational expert also testified that claimant's past relevant work as a cook was light semiskilled as generally performed, but medium as performed; janitorial, medium semiskilled; construction worker II, very heavy skilled; construction, heavy semiskilled; and roofer, medium skilled." (Tr. 27)

[13] Martin further states in an affidavit submitted to the Appeals Council that he also had to reach overhead with both arms to place each pair of jeans into the press (Tr. 429) Because Martin's RFC limits him to occasional overhead reaching with the left upper extremity, this factor would also prevent him from returning to his past work as a press operator.

-28-

*Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir. 1997) (quoting *Groeper v. Sullivan*, 932 F.2dI234, 1238-39 (8th Cir. 1991)).

During the hearing in the present case, the ALJ made only a cursory inquiry regarding the actual demands of the press operator job.  He asked Martin what the job entailed, and was told that it involved "[p]ressing 2,500 pairs of blue jeans a night." (Tr. 464) "So you were standing and using [a] machine?" the ALJ asked next (*id.*) Martin responded in the affirmative, and there were no further questions. No mention was made of Martin's written responses regarding the physical demands of the press operator job either at the hearing or in the ALJ's decision.  When asked to characterize Martin's past work, the vocational expert (VE) simply responded that "[p]ress operator is in the DOT [*Dictionary of Occupational Titles* (4th ed. 1991)] as light and two, unskilled." (Tr.467)

I find there is not substantial evidence to support the ALJ's determination that Martin is capable of returning to his past work as a press operator.  To the contrary, I find that Martin has carried his burden of proof at step four.  I will next consider the ALJ's alternative finding at step five of the evaluation process that Martin has the capacity to perform other work.

### C.  Step Five

The ALJ found at step five of the evaluation process that "even if it were assumed for the purposes of this decision the claimant was incapable of performing past relevant work, the vocational expert testified there are jobs existing in significant numbers in the national economy that the claimant could perform."  (Tr. 27)  More specifically, the ALJ stated:

> I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience and residual functional capacity. The vocational expert was asked to assume an individual who can lift and carry 20 pounds

occasionally and 10 pounds frequently; who can stand and/or walk 6 of 8 hours; who can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; who must never climb ropes, scaffolds, ladders; who must avoid concentrated exposure to vibration and hazards; and who can occasionally reach overhead with the left upper extremity. The vocational expert testified that given all of these factors the individual could perform the claimant's past relevant work as a press operator only. Ms. Najarian [the VE] also identified other work such an individual could perform such as Meat Cutter, *Dictionary of Occupational Titles* (*DOT*) 525.687-070, light unskilled, with 285 such positions existing in the state economy and 79,134 nationwide; Hand Packer, *DOT* 920.687-042, light unskilled, with 1,465 positions existing in the state economy and 128,833 nationally; and Solderer-Assembler, *DOT* 813.684-022, light unskilled, with 596 such positions available in the state economy and 62,379 nationwide.

(Tr. 27)

"Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007). Martin claims the hypothetical question was incomplete because it did not include five additional limitations suggested by the medical evidence. I find no merit to these claims.

First, Martin points to a statement contained in a hospital discharge summary dated November 13, 2004, immediately following his back surgery, in which Dr. Tomes instructed Martin to "limit his bending and twisting . . . as much as he can." (Tr. 249) This restriction, however, pertained only to a 4-week period following Martin's discharge from the hospital.[14] The ALJ's decision states that "[t]he functional

---

[14] Dr. Tomes' full statement was as follows: "The patient was discharged to home on November 13, 2004. He will follow up in my clinic in approximately four weeks. *In the meantime* he should limit his bending and twisting at the waistline as

limitations imposed at the time of surgery discharge in November, 2004 (Exhibit 15F, p. 8) are afforded significant weight at least for the time period assessed." (Tr. 26)

Second, Martin relies upon statements made by Gary Nielsen, a chiropractor who provided treatment between July 30 and September 10, 2004, that "[c]arrying anything less than ten pounds would be appropriate" but "[l]ifting is out of the question."  (Tr. 297) This assessment was made when "[t]est results indicate[d] considerable lumbar sprain and strain with associated low back, sacral or ilium subluxations.  Possible disc problems or nerve root compressions as well may be indicated."  (*Id.*)  Once Martin decided to have surgery on his lower back he did not continue the chiropractic treatment (Tr. 298).

Third, Martin relies upon another statement made by chiropractor Nieslen that "[b]ending would be inappropriate for his low back."  (Tr. 297) Again, this opinion concerned Martin's condition prior to back surgery.

Fourth, Martin notes that in a report of a psychological evaluation prepared on June 10, 2002, in connection with his first claim for benefits, the diagnosis included "Rule Out Reading Disorder, based on reported educational history" and "Rule Out Arithmetic Disorder, based on reported educational history" (Tr. 188).  The report indicated that Martin "receive[d] special education assistance for reading and arithmetic." (Tr. 185) Martin claims the ALJ should have investigated further before instructing the VE to assume a tenth grade education. I disagree. "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 2011 WL 3330504, at *5 (8th Cir. 2011).

Fifth, and finally, Martin notes that the 2002 psychological evaluation report also states that "[u]nder episodes of stress, Martin is likely to become irritable and

_____

much as he can."  (Tr. 249 (emphasis supplied))

angry." (Tr. 187).  However the psychologist found "no restrictions with regard to activities of daily living" and stated that "[s]ocial functioning is well intact." (*Id.*)  The report also states: "Sustained attention and concentration were adequate today and there appears to be no problem with short-term memory or his ability to carry out instructions under supervision.  Relating to coworkers and supervisors would seem to be appropriate.  Adapting to change is also possible."  (*Id.*)

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).  "The ALJ's hypothetical question included all of [Martin's] limitations found to exist by the ALJ and set forth in the ALJ's description of [Martin's] RFC."  *Id.* Because "the ALJ's findings of [Martin's] RFC are supported by substantial evidence, . . . [t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits."  *Id.* (quoting *Lacroix*, 465 F.3d at 889).

### III. Conclusion

Accordingly, I conclude that the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

September 21, 2011.                    BY THE COURT:

                                       *Richard G. Kopf*
                                       United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.